# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 04-1643/04-2203

_____

| | | |
|---|---|---|
| Douglas Companies, Inc., | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Commercial National Bank | * | |
| of Texarkana, | * | |
| | * | |
| Defendant - Appellant. | * | |
| | * | Appeal from the United States |
| ---------------------------- | * | District Court for the Western |
| | * | District of Arkansas. |
| Commercial National Bank | * | |
| of Texarkana, | * | |
| | * | |
| Third Party Plaintiff - | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Wells Fargo Bank Texas, N.A., | * | |
| | * | |
| Third Party Defendant- | * | |
| Appellee. | * | |

_____

Submitted:  January 13, 2005
Filed:  August 19, 2005

_____

Before WOLLMAN, MURPHY, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

Commercial National Bank of Texarkana (CNB) appeals the district court's[1] order denying its motions for judgment as a matter of law (JAML) and a new trial following a jury verdict in favor of Douglas Companies (Douglas) and Wells Fargo Bank Texas (Wells Fargo). CNB also appeals the district court's order awarding attorney's fees to Douglas and Wells Fargo. We affirm.

I

Douglas is a wholesale grocery, beverage and tobacco supplier which serviced several convenience stores in Arkansas and Texas owned by USA Express (USA). On April 28, 2000, USA issued Douglas a check for $240,000 to pay for merchandise, and Douglas deposited the check into its account at CNB. CNB's proof operator mistakenly encoded the check for $24,000 and sent it on to USA's bank – Wells Fargo. Wells Fargo failed to notice the encoding error and debited USA's account for $24,000. As a result, Douglas's account was credited with only $24,000 or $216,000 less than the payment from USA.

Douglas received its bank statement showing the deposit error within days of the transaction. Douglas's controller, however, had quit in late 1999 and it was unable to find an immediate replacement. By the time a new controller was hired there was a three-month backlog. Additionally, the new controller became ill during the spring of 2000, adding to the backlog. Consequently, Douglas did not reconcile its April 2000 bank statement until November 2, 2000. On November 2, when

_____

[1]The Honorable Harry F. Barnes, United States District Judge for the Western District of Arkansas.

Douglas's controller discovered the mistake, she immediately called CNB. CNB reviewed its records, discovered the encoding error and advised the controller the mistake would be corrected. Relying on CNB's assurances, the controller did not tell Steven Douglas, Douglas's president, about the discrepancy.

On November 3, 2000, CNB credited Douglas's account with $216,000 and sent an adjustment request for $216,000 to Wells Fargo through the Federal Reserve System. The Federal Reserve, however, does not process adjustment requests over 180 days old. CNB's employee testified she sent the request through the Federal Reserve hoping it would not notice it was untimely. She also testified the Federal Reserve had processed stale requests in the past. This time, the Federal Reserve rejected the adjustment request and on November 6, 2000, returned it to CNB. On November 7, 2000, CNB mailed an adjustment request directly to the Wells Fargo branch bank in Houston, Texas. CNB's employee testified she did not make any inquiries to verify where the adjustment request should be mailed. Instead, she consulted her "big bank book" and looked up the address for Wells Fargo, Houston. She further testified she chose not to telephone or fax the request. CNB's president testified the information should have been verified.

The adjustment request was received by Wells Fargo, Houston, sometime after November 7 but before November 14. Individual Wells Fargo banks, however, because of the large volume of such requests, do not process adjustment requests. Instead, adjustment requests are handled by regional adjustment centers. Thus, when the request was received in Houston it was forwarded to Wells Fargo's Southwestern Adjustment Center (SAC) in Phoenix, Arizona. SAC logged the request in on November 14, 2000, and generated an automatic notice to CNB indicating the request had been received and would be processed in the normal course of business. Wells Fargo's employee worked on the adjustment request on November 17 and 20, but because she looked in the wrong data base could not find any record of the USA check. On November 28, having found no record of the check, Wells Fargo closed

-3-

out the request without notice to CNB of its findings. The parties agree that between November 7 and November 14, there were occasions when USA's Wells Fargo account had sufficient funds to cover the discrepancy, e.g., on November 14, 2000 the account held a balance of $240,566.70. On November 15, 2000, however, the funds were transferred out of the account and there were no longer any funds to pay the adjustment request.

As these events were unfolding, USA was sliding into insolvency. By the summer of 2000, USA had defaulted on a loan from its bank, Credit Suisse First Boston (CSFB). In September 2000, USA agreed to sign over its assets to CSFB in lieu of foreclosure. CSFB, in turn, in hopes of minimizing its losses on the defaulted loan, formed Houston Convenience (Houston) to continue operating the convenience stores. In order to ensure Douglas would continue supplying the convenience stores, Houston contacted Douglas and advised it would bring all of USA's accounts with Douglas up to date. Between October 25, 2000, and November 13, 2000, Houston paid Douglas $719,000. On November 15, 2000, Houston closed USA's account at Wells Fargo and transferred the funds into its account.

At the time Houston agreed to pay USA's indebtedness to Douglas, Steven Douglas remained unaware of the problem with USA's earlier payment dating back to April 2000. The controller, relying on CNB's assurances, had never mentioned the matter because the $216,000 had been deposited into Douglas's account. The parties agree Houston would have paid the additional $216,000 had it been advised of the problem.

In January 2001, CNB, having heard nothing from Wells Fargo's adjustment center, followed up on its adjustment request. SAC reviewed its file and after conducting further investigations located USA's April check and confirmed the $216,000 encoding error. Unfortunately, the account had been closed on November 15, 2000, when Houston transferred the money to its account. SAC notified CNB

-4-

there were no funds in the account and denied the adjustment request. CNB advised Douglas of these developments and reversed the $216,000 credit previously issued to Douglas. Steven Douglas met with CNB officials and it was agreed CNB would re-credit his account pending further investigations. CNB then wrote Houston asking it to pay Douglas in accordance with its agreement to take care of USA's indebtedness to Douglas. Houston, however, refused and on March 5, 2001, filed for bankruptcy. Thereafter, CNB again debited Douglas's account for $216,000.

On January 14, 2002, Douglas sued CNB for negligence and breach of contract. Douglas contended CNB owed a duty to use reasonable care and breached the duty when it improperly encoded USA's check. Douglas also contended it had an implied contract with CNB requiring CNB to properly credit its account and it breached the contract by erroneously encoding the check.

CNB denied liability arguing Douglas's suit was barred by the parties' account agreement (agreement) which required Douglas to review its bank statement and bring any errors to CNB's attention within sixty days. CNB also argued it exercised reasonable care in handling Douglas's account. Additionally, CNB filed a third-party complaint alleging Wells Fargo failed to settle by the midnight deadline, failed to exercise ordinary care, and failed to act in good faith. Wells Fargo counterclaimed alleging negligence and a violation of the Uniform Commercial Code encoding warranty.

Before trial, the district court denied CNB's motion for summary judgment finding Douglas's suit was not barred by the agreement. In particular, the court held the agreement's sixty-day notice provision only applied to alterations or forgeries and not encoding errors. In other words, the agreement governed Douglas's duty to notify CNB of improper withdrawals from the account, not errors relating to deposits into the account. The district court also held the relative negligence of the parties was a question for the jury.

The case was tried and the jury found for Douglas and awarded $216,000.  The jury rejected CNB's third-party claims against Wells Fargo and judgment was entered accordingly.  In post-trial motions, the district court denied CNB's motions for JAML and a new trial, and awarded attorney's fees to Douglas and Wells Fargo.  CNB now appeals the denial of its post-trial motions and the award of attorney's fees.

II

A.     The Agreement

CNB first argues the district court erred in denying its motion for JAML because Douglas's suit is barred by the parties' account agreement.  We disagree.

The agreement provides

You [Douglas] must examine your statement of account with "reasonable promptness."  If you discover (or reasonably should have discovered) any unauthorized payments or alterations, you must promptly notify us of the relevant facts.  If you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we exercised ordinary care and, if not, whether we substantially contributed to the loss).  The loss could be not only with respect to items on the statement but other items forged or altered by the same wrongdoer.  You agree that the time you have to examine your statement and report to us will depend on the circumstances, but that such time will not, in any circumstance, exceed a total of 30 days from when the statement is first made available to you.

You . . . agree that if you fail to report any unauthorized signatures, alterations, forgeries or *any other errors* in your account within 60 days of when we make the statement available, you cannot assert a claim against us on any items in that statement, and the loss will be entirely

yours. This 60 day limitation is without regard to whether we exercised ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

(Emphasis supplied).

Focusing on the second paragraph, CNB argues the agreement expressly bars Douglas's claim because the encoding error falls within the agreement's "any other errors" provision and Douglas failed to bring the error to CNB's attention within the sixty-day limitation. The district court, however, concluded the agreement relates only to alterations or forgeries resulting in unauthorized payments from the account, and thus the encoding error did not have to be reported within sixty days.

We review the district court's interpretation of the agreement de novo in light of the controlling legal principles, which here, as the parties agree, are provided by Arkansas law. United Fire & Cas. Ins. Co. v. Garvey, 328 F.3d 411, 413 (8th Cir. 2003).

The time within which a bank customer must notify the bank of an error is governed by Ark. Code Ann. § 4-4-406 (UCC § 4-406) (requiring a customer to inform a bank within one year after the statement of an alteration or unauthorized signature). The time limit or statute of limitation for notifying a bank may be, and frequently is, altered by agreement of the parties. See Ark. Code Ann. § 4-4-103 (UCC § 4-1-3) (allowing for the modification of the time limits for providing notice to a bank). Courts have upheld agreements imposing notice periods as short as thirty and fourteen days. See PTA Sch. No. 72 v. Mfr's Hanovers Trust, 524 N.Y.S.2d 336, 340 (1988); Qassemzadeh v. IBM Employees Fed. Credit Union, 561 N.Y.S.2d 795, 795 (1990). The vast majority of such cases, however, involve instances of forgery, alteration or unauthorized withdrawal and focus solely on the reasonableness of the notice period. Here, the reasonableness of the notice period is not at issue. Rather, the issue is whether the agreement imposed on Douglas a duty to report the encoding

-7-

error within sixty days. The district court, relying on <u>SOS Oil Corp. v. Norstar Bank of Long Island</u>, 563 N.E.2d 258 (N.Y. 1990) and <u>Gabalac v. Firestone Bank</u>, 346 N.E.2d 326 (Ohio Ct. App. 1975), held encoding errors are not encompassed by such agreements, and Douglas's failure to report the encoding error within sixty days did not bar its suit against CNB.

<u>SOS Oil</u> involved a dispute between a customer, SOS, and its bank, Norstar, which underencoded a check deposited directly into SOS's account by a third-party, Conlo Services. 563 N.E.2d at 259-60. When the mistake was discovered by SOS fifteen months later, it demanded Norstar credit the correct amount. By then, however, Conlo Services was out of business and its account closed. <u>Id.</u> at 260. SOS brought suit against Norstar alleging breach of the midnight deadline rule, negligence, and breach of contract. Among other defenses, Norstar argued SOS's claims were barred by its failure to notify Norstar of the error within fourteen days as required by the account agreement. <u>Id.</u> The trial court granted summary judgment in favor of SOS and the intermediate appellate court affirmed.

Norstar appealed to the New York Court of Appeals arguing the claim was barred by the account agreement which provided

> Unless the Corporation shall notify the Bank in writing within fourteen calendar days of the delivery or mailing of any statement of account and cancelled check, draft or other instrument for the payment of money (hereinafter referred to as 'Instrument') *of any claimed errors in such statement*, or that the Corporation's signature upon any such returned Instrument was forged, or that any such Instrument was made or drawn without the authority of this Corporation or not in accordance with the signature arrangement set forth in paragraph 2(a) hereof, or that it was raised or otherwise altered, or unless this Corporation shall notify said Bank in writing within six months after the delivery, or mailing of any such Instrument that any endorsement was forged, improper, made without the authority of the endorser or missing, said statement of

-8-

account shall be considered correct for all purposes and said Bank shall not be liable for any payments made and charged to the account of the Corporation *or for any other errors* in the statement of account as rendered to it.

SOS Oil, 563 N.E.2d at 261-62 (emphasis added).

As CNB does here, Norstar argued the all-inclusive language requiring timely notification of "any claimed errors" or "any other errors" required SOS to notify the bank of its encoding error within the specified time. The Court of Appeals rejected the argument finding the notification requirements in the deposit agreement did not apply to encoding errors.

Indeed, [the bank's] argument that the time requirements are a permissible variation of SOS's obligation to examine its bank statements under UCC-406 itself reveals that the resolution is concerned with payments made *out of* the customer's account, where the customer will be able to compare the debit entries against the underlying items. UCC 4-406 applies "[w]hen a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries" – quite different from the present situation.

Id. at 262 (citation omitted) (emphasis in original).

CNB contends § 4-4-103 permits banks and their customers to deviate, by agreement, from the UCC provisions which would otherwise control their relationships. The agreement with Douglas, however, as in SOS Oil, was intended to modify § 4-4-406 which deals with a customer's duty to discover and timely report unauthorized signatures or alterations; the section says nothing about encoding errors. We do not believe the agreement, which modified the time and notice provisions, otherwise changed the scope of § 4-4-406. Further, we find no authority, and CNB fails to cite any, permitting parties to expand the scope of § 4-4-406 to impose a duty on customers to give notice of encoding errors. In the absence of such authority, we

hold the agreement applies only to the types of transactions or errors specifically identified in § 4-4-406, i.e., unauthorized signatures and alterations.

This is not to say customers have no obligation to examine bank statements for errors not specifically identified in § 4-4-406. In Gabalac, 346 N.E.2d at 328-29, the court held customers have such a duty which is gauged by a standard of reasonable care. Thus, whether Douglas acted reasonably under the circumstances of this case was a question properly submitted to the jury.

B.    Sufficiency of the Evidence

CNB next attacks the sufficiency of the evidence. It contends its actions were consistent with general banking practices and despite the encoding error it acted reasonably at all times. Further, CNB argues it could not forecast nor control USA's insolvency and Douglas's untimely examination of its bank statement which combined to cause or contribute to this loss. Finally, CNB argues Wells Fargo was negligent because it should have acted on the adjustment request before November 15, 2002, while there were sufficient funds in USA's account.

We review the district court's denial of a motion for judgment as a matter of law de novo using the same standards as the district court. Keenan v. Computer Assocs. Int'l, 13 F.3d 1266, 1268 (8th Cir. 1994). A motion for judgment as a matter of law presents a legal question to the district court and this court on appeal: "[W]hether there is sufficient evidence to support the jury's verdict." Id. (quoting White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992)). We consider the "evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility." Id.

CNB argues encoding errors are part and parcel of the banking industry, and therefore, the encoding error was not evidence of negligence. CNB concedes banks

are required to use ordinary care when processing checks, Ark. Code Ann. § 4-4-202 (UCC 4-202), but it argues compliance with Federal Reserve regulations and operating circulars presumptively establishes ordinary care, Ark. Code Ann. § 4-4-103(c) (UCC 4-103). CNB contends, without identifying any particular regulation or circular, its procedures for encoding checks complied with said regulations and therefore it was not negligent. We find little merit in this argument. Assuming CNB's encoding procedures complied with Federal Reserve regulations, an error nonetheless occurred within the process. And encoding errors, just like motor vehicle accidents, do not escape the scrutiny of a jury simply because they are known to occur. Thus, we conclude the district court was correct in holding the issue of CNB's negligence was for a jury to decide.

Next, CNB contends Douglas's failure to reconcile its bank statement and USA's insolvency were intervening acts over which it had no control and both interrupted any causal connection between CNB's negligence and Douglas's loss. Again, we disagree.

> The original (negligent) act or omission is not eliminated as a proximate cause by an intervening cause unless the latter is in itself sufficient to stand as the cause of the injury and the intervening cause must be such that the injury would not have been suffered except for the act, conduct, or effect of the intervening cause totally independent of the acts or omissions constituting the primary negligence.

Ouachita Wilderness Inst. v. Mergen, 947 S.W.2d 780, 785 (Ark. 1997).

Douglas's failure to reconcile its bank statement and USA's insolvency would not, of themselves, have caused the $216,000 loss absent CNB's initial failure to properly encode the check. Thus, they are not sufficient intervening causes to sever the causal connection between CNB's negligence and the loss. As such, it was proper for the district court to present these issues to the jury for resolution.

Finally, CNB argues Douglas's loss was occasioned by Wells Fargo's failure to act on the adjustment request while there were sufficient funds in the USA account. It is undisputed the adjustment request arrived at SAC at least one day before Houston closed out USA's account. It is also undisputed there were sufficient funds on November 14, 2000, to cover the adjustment request. Accordingly, pursuant to Ark. Code Ann. § 4-4-209, CNB argues it only breached its encoding warranty if there were insufficient funds in USA's account at the time Wells Fargo learned of the underpayment. In other words, Wells Fargo, by failing to immediately act on the adjustment request, failed to mitigate its damages.

Arkansas law imposes an encoding warranty on banks. The law also imposes a concomitant duty on payor banks to mitigate damages once they become aware of encoding errors. When carrying out these obligations, banks are required to exercise ordinary care. The district court concluded it could not determine as a matter of law whether CNB or Wells Fargo had been negligent. Thus, it could not determine which UCC provision, if any, had been breached. Because the evidence of negligence was disputed it was necessary to submit the question to a jury for resolution. Here, the jury heard the evidence and determined CNB was negligent. We conclude the evidence was sufficient to support the verdict.

C.    Instructional Error

CNB next contends the UCC provisions relevant to this case are designed to allocate losses based on which party is in the best position to avoid the loss. It argues the district court should have instructed the jury as to each of the controlling UCC provisions and asked it to determine which had been breached. Instead, the district court concluded the UCC provisions would have confused the jury so it instructed using traditional negligence principles. Then, based on answers given by the jury to various interrogatories, the district court applied the answers to the applicable UCC

-12-

provisions.  CNB argues the district court committed instructional error in doing so.  We disagree.

"A trial court has broad discretion in formulating jury instructions", Vaaughn v. Ruoff, 304 F.3d 793, 795 (8th Cir. 2002), and absent a clear abuse of discretion this court will not order a new trial, Fogelbach v. Wal Mart Stores, Inc., 270 F.3d 696, 699 (8th Cir. 2001).

It is unnecessary to consider this argument in great detail.  As noted above, the UCC imposes liability on banks for encoding errors when a bank has failed to exercise ordinary care.  Similarly, the UCC imposes liability on payor banks that fail to exercise ordinary care when mitigating damages.  Both provisions apply to this case but the evidence as to whether CNB or Wells Fargo failed to exercise ordinary care was conflicting.  Therefore, the district court recommended instructing the jury using traditional concepts of negligence and designed a set of interrogatories asking the jury to decide which of the parties failed to exercise ordinary care.  This plan avoided requiring the jury to sift through the intricacies of the UCC.  Once the jury concluded CNB was negligent, the court applied § 4-4-209 to find CNB breached its encoding warranty and was responsible for the loss.

The district court's solution to this potentially confusing problem was far from an abuse of discretion.  Further, it should be noted CNB submitted proposed jury instructions based on the various UCC provisions but did not object when the district court proposed proceeding in the manner outlined above.  We find no abuse of discretion and affirm the district court's denial of CNB's motion for a new trial based on instructional error.

D.    Attorney's Fees/Prejudgment Interest[2]

The district court awarded attorney's fees to Douglas and Wells Fargo based on Ark. Code Ann. § 16-22-308 which provides in relevant part: "In any civil action to recover on . . . [a] *negotiable instrument* . . . the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs." (emphasis supplied).  The court concluded Douglas's action against CNB was based on a failure to use ordinary care in handling an "item" [USA's check] under the UCC. The court also concluded, the check was a negotiable instrument because under the UCC an "item" is "an *instrument* or promise or order to pay money handled by a bank for collection or payment" and an instrument is defined as "a negotiable instrument." See Dist. Ct. Order at 2; see also §§ 4-4-103(a) & (e); 4-4-104(a)(9); 4-3-104(b) (emphasis supplied).

CNB, however, argues the section is inapplicable because Douglas sued it for negligence, breach of an implied contract, waiver and equitable estoppel, not for any violation of the UCC.  We disagree.  Douglas's claim against CNB was premised on its failure to use ordinary care in complying with Ark. Code Ann. §4-4-202, requiring a collecting bank to exercise ordinary care in presenting a check (negotiable instrument) for payment to a payor bank.  The district court's focus on whether CNB acted with ordinary care in fulfilling those statutory duties did not transform this into an action for common law negligence.

CNB also argues the claim was not an action "on" the USA check because CNB was not a party to the check and had no liability on the check.  Section 16-22-308, however, contains no requirement that an action to recover on a negotiable instrument be only against a party to the negotiable instrument.

_____

[2]CNB attacks the district court's authority to award fees but does not contend the award was excessive.

-14-

Finally, CNB's arguments regarding the award of prejudgment interest are without merit.  The amount of the claim - $216,000 - was readily ascertainable and thus the award was proper.  See Woodline Motor Freight, Inc. v. Troutman Oil Co., 938 S.W.2d 565, 568 (Ark. 1997).

III

The judgment of the district court is affirmed.

_____